IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Odell Cobbs, | ) | C/A No.: 1:15-1972-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On December 20, 2006, Plaintiff filed an application for DIB in which he alleged his disability began on March 23, 2003. Tr. at 151–55. His application was denied initially and upon reconsideration. Tr. at 53, 55. On August 4, 2009, Plaintiff had a

hearing before Administrative Law Judge ("ALJ") Richard L. Vogel. Tr. at 28–39. The ALJ issued an unfavorable decision on October 28, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 59–66. On August 21, 2010, the Appeals Council remanded the matter for further review. Tr. at 68–70. The ALJ held a second hearing on May 31, 2011. Tr. at 40–52. He issued a second unfavorable decision on June 9, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 10–27. On October 4, 2012, the Appeals Council denied Plaintiff's request for review. Tr. at 793–96. Plaintiff brought an action seeking judicial review of the Commissioner's final decision in a complaint filed on December 7, 2012. Tr. at 797–800. On February 4, 2014, the court issued an order reversing the Commissioner's decision and remanding the matter for further administrative proceedings pursuant to 42 U.S.C. § 405(g). Tr. at 801–19. The Appeals Council subsequently issued an order remanding the case to an ALJ. Tr. at 820–23. Plaintiff appeared for a third hearing before ALJ Edward T. Morriss on August 27, 2014. Tr. at 754–74. The ALJ issued an unfavorable decision on January 12, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 735–53. The ALJ's decision provided Plaintiff with options to either file exceptions with the Appeals Council within 30 days or to file an action in this court within 60 days of the date on which the ALJ's decision became final.[1] Tr. at 735–36. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 11, 2015. [ECF No. 1].

---

[1] The ALJ's decision explained that it would become the final decision of the Commissioner on the sixty-first day after the date it was issued.

###### B.    Plaintiff's Background and Medical History

###### 1.    Background

Plaintiff was 66 years old at the time of the third hearing. Tr. at 757. He completed high school. *Id.* His past relevant work ("PRW") was as a grave digger and a house painter. Tr. at 846. He alleges he has been unable to work since March 23, 2003. Tr. at 738. However, because the record contains a prior decision finding that Plaintiff was not disabled through June 2, 2005,[2] the period relevant to the case is June 3, 2005, through Plaintiff's date last insured ("DLI") of December 31, 2008.[3] Tr. at 760.

###### 2.    Medical History

Plaintiff received treatment for both his physical and mental conditions at the Department of Veterans Affairs ("VA") Hospital. The record contains treatment notes from January 7, 2002, through July 28, 2009. Tr. at 240–43, 288–31, 333–456, 496–551, 578–734.

During this period, Plaintiff was diagnosed with prostate cancer and received treatment. In 2003, Plaintiff received a diagnosis of conventional adenocarcinoma of his right prostate gland with a Gleason's grade of 4+3. Tr. at 297–98. He delayed treatment for reasons such as wanting to attend an upcoming wedding (Tr. at 309), not wanting to sit somewhere to receive treatment for two to three hours (Tr. at 372), and not wanting to lose sexual functioning (Tr. at 363, 543–44). In February 2007, Plaintiff began receiving

---

[2] The ALJ noted that although Plaintiff asserted an onset date of March 23, 2003, *res judicata* applied to the period between the alleged onset date and June 2, 2005, the date of the final decision on a prior claim in which Plaintiff did not appeal the adverse decision. Tr. at 738.

[3] Plaintiff was born on January 28, 1948, and was 60 years old on his DLI. Tr. at 53.

luteinizing-hormone releasing hormone ("LHRH") therapy every three months to treat prostate cancer. Tr. at 517. On March 8, 2007, mental health follow-up notes indicate that Plaintiff endorsed hot flashes, poor mood, and dyspepsia following his first LHRH treatment. Tr. at 537–39. Plaintiff reported incontinence secondary to his cancer treatment on May 3, 2007. Tr. at 517–18. On May 10, 2007, Plaintiff reported significant side effects from his cancer treatment that included hot flashes, night sweats, and easy fatigability. Tr. at 514. Plaintiff began receiving Zoladex injections to treat prostate cancer in February 2008. Tr. at 706. On June 11, 2008, Plaintiff indicated the Zoladex caused him to have low energy. Tr. at 691. Plaintiff began radiation therapy in or around September 2008. Tr. at 672–73. On November 6, 2008, he reported poor mood, low energy, diarrhea, and stomach upset as side effects from radiation and indicated he was taking naps on-and-off throughout the day. Tr. at 659, 662. By December 2008, Leander Cannick, III, M.D., noted that, after treatment, there was no evidence of the disease and Plaintiff had not experienced any acute radiation-related toxicities. Tr. at 653. On March 5, 2009, Plaintiff reported to David Marshall, M.D. ("Dr. Marshall"), that he continued to have bladder spasms and occasional dysuria. Tr. at 642. Plaintiff continued to receive Zoladex injections through 2009. Tr. at 633, 643.

On August 17, 2006, Plaintiff underwent an examination by Stan Saylor, M.D. ("Dr. Saylor"), for a possible increase in service-connected compensation for hepatitis C. Tr. at 350–52. Dr. Saylor indicated Plaintiff had chronic hepatitis C, but that his only significant complaints were right upper quadrant abdominal pain and vague malaise. Tr. at 352. He found that Plaintiff had no signs, symptoms, or manifestations of cirrhosis. *Id.*

4

Plaintiff's physicians subsequently indicated Plaintiff was not a candidate for hepatitis C treatment because of his prostate cancer. Tr. at 733.

Plaintiff was also treated for other physical complaints over this period, such as occasional knee pain, leg weakness, fatigue, sleep apnea (reportedly stable and controlled with home oxygen at night), headaches, diabetes, and hypertension (reportedly well controlled with medication). *See, e.g.*, Tr. at 311, 620, 637, 671, 731. On January 11, 2006, a whole body scan showed Plaintiff to have increased radiotracer uptake in his bilateral knees and feet, which likely represented arthropathy. Tr. at 445. A bone scan on January 4, 2007, indicated increased uptake at the L5-S1 interface that was likely related to degenerative disc disease with osteophyte formation. Tr. at 494. The scan also indicated increased uptake in the metacarpal and metacarpophalangeal joints of Plaintiff's bilateral hands, knees, and ankles that likely represented osteoarthritic changes. *Id.* On March 22, 2007, Plaintiff underwent a comprehensive orthopedic evaluation. Tr. at 457–60. He complained that he experienced tightness in his legs and that his left knee sometimes gave out. Tr. at 457. He reported leg swelling, nausea, constipation, shortness of breath, mood problems, right shoulder pain, and arthritis. *Id.* Douglas E. McGill, M.D. ("Dr. McGill"), noted that Plaintiff was able to follow simple instructions. Tr. at 458. He described Plaintiff's breathing as "somewhat labored with activity but not distressed." *Id.* He noted that Plaintiff could get on and off the exam table and could put on and take off his clothes, but that both activities required extra time and some exertion. *Id.* Plaintiff demonstrated motor strength within functional limits. *Id.* He had reduced range of motion ("ROM") with flexion, extension, and lateral flexion of his lumbar spine and flexion,

forward elevation, and internal and external rotation of his bilateral shoulders. Tr. at 459. His balance was impaired with tandem and heel-toe walking. Tr. at 460. He had difficulty squatting and demonstrated a slow, wide-based gait. *Id.* Dr. McGill noted that Plaintiff had trace edema in his lower extremities and crepitus in his knees. Tr. at 458, 460. He indicated Plaintiff had diagnoses of active and likely progressive prostate cancer, hepatitis C, and a long history of post-traumatic stress disorder ("PTSD") and depression. *Id.* He stated Plaintiff had problems with cardiopulmonary endurance and musculoskeletal limitations that were likely to progress with prostate cancer. *Id.* He assessed Plaintiff as having "significant mental and physical limitation which will most likely worsen over time." *Id.* Radiological reports dated March 22, 2007, showed "mild osteoarthritis" in Plaintiff's left knee, but no acute bony abnormalities in his right elbow, right shoulder, or right foot. Tr. at 462–65. Physical therapist Louis Gourdine observed Plaintiff to demonstrate right leg weakness and issued a standard walking cane on March 11, 2008. Tr. at 620. On April 2, 2009, an x-ray of Plaintiff's lumbosacral spine showed thoracic and lumbar spondylosis. Tr. at 579.

The notes reflect that Plaintiff received mental health treatment for PTSD, depressed mood, and anxiety. On July 13, 2005, Plaintiff underwent a compensation and pension ("C&P") exam that resulted in a 50 percent impairment rating for PTSD related to service in Vietnam. Tr. at 353–57. Plaintiff reported social isolation; suffering from combat-related nightmares two to three times a week; having frequent intrusive memories about Vietnam; being in consistent hyperarousal with exaggerated startle responses to sudden movements and loud noises; and experiencing concentration problems,

irritability, anger, and numerous episodes of physical aggression. Tr. at 354–55. On December 12, 2005, Plaintiff told Kimberly Bush, M.D., that his tolerance of closed spaces had slightly improved, his nightmares were less frequent, and he felt more relaxed on Risperdal, but still felt "on edge." Tr. at 435–36.

On February 13, 2006, Plaintiff reported feelings of restlessness with inability to sit still, continued nightmares, occasional flashbacks, more frequent intrusive memories, and continued isolative behavior. Tr. at 416. Mental health follow-up notes dated August 17, 2006, indicate that Plaintiff's mood was mostly poor, that he frequently felt short-tempered, had very little motivation, suffered from difficulty concentrating, and endorsed some anxiety symptoms, including being afraid of enclosed spaces and being around a lot of people. Tr. at 387. The examiner's opinion was that Plaintiff's PTSD symptoms were well controlled, but that his mood had not improved with medication. Tr. at 388–89. On August 28, 2006, a C&P exam report indicated that Plaintiff had a 70 percent disability rating for PTSD and a 100 percent disability rating for malignant neoplasm. Tr. at 347. Kay McNeill, M.D. ("Dr. McNeill"), indicated Plaintiff was somewhat vague in identifying how his symptoms had worsened, but stated that he had "very short patience"; frequently became irritable with his wife; completely avoided other people to prevent himself from getting into fights; had nightmares an average of twice a week; and had crying spells when by himself. Tr. at 347–48. Plaintiff indicated he neglected his hygiene and that his wife had to insist he shower and groom himself. Tr. at 348. He stated he no longer participated in social activities or personal interests and had not maintained his friendships. *Id.* Dr. McNeill indicated Plaintiff was poorly groomed and displayed a flat

affect. *Id.* She stated Plaintiff kept dark glasses on during the interview in an attempt to avoid eye contact. *Id.* She noted Plaintiff was "a vague and somewhat disjointed historian." *Id.* Plaintiff denied suicidal and homicidal ideations, but indicated he was angry, irritable, and felt like giving up. Tr. at 348–49. Dr. McNeill assessed chronic and moderate PTSD, recurrent major depressive disorder with moderate symptoms, and a history of polysubstance abuse with a two-year history of sobriety. Tr. at 349. On October, 6, 2006, Plaintiff stated he was not taking Citalopram as directed because it caused headaches. Tr. at 381. Plaintiff endorsed low mood and indicated he was spending little time with others. *Id.* H. Biemann Othersen, III, M.D. ("Dr. Othersen"), discontinued Citalopram and prescribed Sertraline. *Id.* Plaintiff followed up with Nicole R. Post, M.D. ("Dr. Post"), on November 15, 2006. Tr. at 372–75. He reported depression, unusual sleep patterns, and a preference for being alone. Tr. at 372. Dr. Post noted that Plaintiff's PTSD seemed to be worse in terms of social isolation. Tr. at 374. She increased Plaintiff's antidepressant medication to help his mood and improve symptoms of PTSD. *Id.* On December 19, 2006, D. Slagle, M.S., evaluated Plaintiff's PTSD and wrote that "although [patient] appears to manifest some symptoms consistent with PTSD, the [patient's] most striking[] mental health concern appears to be depression." Tr. at 366.

On January 4, 2007, Plaintiff reported to Dr. Post that he was doing better, and Dr. Post observed that Plaintiff's mood had improved both subjectively and objectively. Tr. at 360. Nevertheless, she increased Plaintiff's dosage of Sertraline to the maximum dosage allowed because of his history of dysthymia and major depressive disorder. *Id.* She encouraged Plaintiff to look for volunteer work and noted that he seemed to feel

better when he was out of the house and engaging with others. Tr. at 361. On March 8, 2007, Plaintiff reported increased somatic symptoms following his first treatment for prostate cancer. Tr. at 537. Plaintiff presented to the mental health clinic for an unscheduled appointment on April 16, 2007. Tr. at 529. He complained of difficulty sleeping, inability to stay inside his house, and a general feeling of anxiousness. *Id.* He suspected his medication was causing problems. *Id.* Dr. Othersen prescribed Sertraline and Diphenhydramine. *Id.* On May 24, 2007, Plaintiff was noted to be doing better from a psychiatric standpoint, but continued to have baseline dysthymia and minor PTSD symptoms. Tr. at 513.

On June 11, 2008, Plaintiff indicated to his mental health case manager that he lost his motivation quickly and often felt a need to leave after visiting someone for only a few minutes. Tr. at 691. He requested that his prescription for Bupropion be discontinued because it caused headaches. Tr. at 692. On August 7, 2008, Plaintiff informed his mental health case manager that he continued to have low energy. Tr. at 681. He reported to Xingchun Tang, M.D. ("Dr. Tang"), that he had some good and some bad days, but was overall doing well. Tr. at 676. Dr. Tang indicated Plaintiff's mental status was normal, aside from poor insight. *Id.*

On February 12, 2009, Plaintiff reported to Elliott Levy, M.D., that he had low energy and difficulty sleeping. Tr. at 644. On July 28, 2009, he reported that he was generally doing okay. Tr. at 621. He noted that his sleep had improved with use of home oxygen and increased activity. *Id.*

C.    The Administrative Proceedings

1.    August 2009 Hearing

At the first administrative hearing on August 4, 2009, Plaintiff appeared unrepresented. Tr. at 30. He testified that he was receiving monthly benefits from the VA. Tr. at 31–32. He stated that he last worked as a grave digger in 2003. Tr. at 32. Plaintiff stated he was unable to work because he tired quickly, used oxygen at home (at night for sleep apnea), had prostate cancer, and had "a lot of other stuff like jaundice and pain in [his] joints." Tr. at 33.

Plaintiff testified that he had received 44 days of radiation treatment for his prostate cancer in October and November of 2008 and that the radiation had successfully killed his cancer cells. Tr. at 33–34. He described the symptoms he experienced during the treatments as including hot flashes and difficulties with elimination. Tr. at 34. Plaintiff also testified that he was being treated for PTSD with Zoloft and Xanax, as well as therapy sessions that occurred "about every two to three months." Tr. at 36–37. He stated that, because of his PTSD, he sometimes felt like he could not stay inside and also experienced dreams that caused him to wake up sweating. Tr. at 36. He told the ALJ he had received no treatment for hepatitis C. Tr. at 37. Plaintiff stated that on a normal day, he stayed around the house and tried to do things outside, but would get overheated. *Id.* He indicated his ankle sometimes flared up and that he took pain medication for it. Tr. at 38.

### 2.     May 2011 Hearing

At the second administrative hearing on May 31, 2011, Plaintiff testified that during the relevant time period, he tired easily, was often short of breath and dizzy, and could not walk very far. Tr. at 44–45. He stated that, on some days, he was only able to walk from his bedroom to the kitchen. Tr. at 45. He reported that he frequently had to use the bathroom, had hot flashes, and had trouble being around crowds. Tr. at 45–46. He stated that he had flashbacks in his dreams. Tr. at 47. He testified that his doctor told him that he is "under control with [his] diabetes and stuff." Tr. at 49.

### 3.     August 2014 Hearing

At the hearing on August 27, 2014, Plaintiff testified that during the period from June 2005 until the end of 2008, he had problems with his memory and with being around others. Tr. at 761. He indicated he avoided going to public places because he felt as if people were watching him, laughing at him, and talking about him. Tr. at 765. He stated he received treatment through the VA as often as three or more times per month. Tr. at 761–62.

Plaintiff testified that he had served in Vietnam. Tr. at 767. He described an incident in which his unit was bombed and shelled and several of his friends were killed. Tr. at 768. He indicated he was hospitalized after the attack. *Id.* He stated he experienced symptoms of PTSD while working as a grave digger. Tr. at 767. He indicated he had dreams that caused him to be anxious when he awoke and that he feared being in enclosed spaces. Tr. at 770–71.

Plaintiff testified he spent most of his days at home by himself, but visited his father for 10 to 15 minutes on some days. Tr. at 763–64. He stated he visited his brother occasionally and that his brother visited him, as well. Tr. at 764. He indicated he spent most of his time watching television and sleeping. *Id.* He stated he occasionally attempted to do yard work, but that it sometimes made him feel weak and short of breath. *Id.* He indicated he sometimes visited stores with his wife. Tr. at 765.

2.    The ALJ's Findings

In his decision dated January 12, 2015, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2008.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of March 23, 2003 through his date last insured of December 31, 2008 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: status/post prostate cancer; hepatitis C; post-traumatic stress disorder ("PTSD"); and obesity (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he could only occasionally climb ladders/ropes/scaffolds. Additionally, he could frequently reach overhead with the right upper extremity and needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. Furthermore, the claimant could understand, remember, and carry out simple instructions and have no ongoing public contact.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on January 28, 1948 and was 60 years old, which is defined as an individual of advanced age, on the date last insured. The

claimant subsequently changed age category to closely approaching retirement age (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from March 23, 2003, the alleged onset date, through December 31, 2008, the date last insured (20 CFR 404.1520(g)).

Tr. at 740–47.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ's step two findings are not supported by substantial evidence because he did not adequately consider Plaintiff's physical impairments;

2)  the ALJ did not adequately consider moderate limitations to concentration, persistence, or pace in the RFC assessment; and

3)  the ALJ failed to obtain VE testimony to support his assertion that Plaintiff could perform a significant number of jobs.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

---

[4]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).
[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's PRW to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

16

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

> B.     Analysis

>> 1.     Consideration of Physical Impairments

Plaintiff argues the ALJ's findings at step two of the evaluation process are not supported by substantial evidence. [ECF No. 14 at 9]. He maintains the ALJ failed to consider evidence that showed him to have limited right shoulder ROM; crepitus in the left knee; trace edema in the lower extremities; a wide-based gait with impaired balance; right leg weakness; and spurring in all three compartments of his spine with mild joint space narrowing and osteoarthritis. *Id.* at 10. He contends the ALJ did not explain why he found that he could walk for six to eight hours per day and lift 50 pounds despite evidence of orthopedic impairments. *Id.* Plaintiff argues the ALJ did not consider his knee impairment as part of the RFC assessment and did not explain why x-rays taken four months after his DLI that revealed a degenerative condition were considered irrelevant. [ECF No. 16 at 1–2].

The Commissioner argues the ALJ's failure to address Plaintiff's orthopedic impairments at step two was remedied by his consideration of the impairments in assessing the RFC. [ECF No. 15 at 12–13]. She maintains the ALJ adequately explained that the medical evidence and Plaintiff's activities of daily living ("ADLs") did not support additional physical limitations. *Id.* at 14.

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, citing SSR 85-28; *see also* 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

The ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

To properly assess an individual's RFC, the ALJ must ascertain the limitations imposed by the individual's impairments and determine his ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* The Fourth Circuit has held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ determined that Plaintiff's severe impairments included status-post prostate cancer, hepatitis C, PTSD, and obesity, but he did not identify any non-severe impairments. Tr. at 740. Although the ALJ did not consider Plaintiff's left knee osteoarthritis, degenerative disc disease, or right shoulder impairment at step two, he stated that he considered these impairments in assessing Plaintiff's RFC. *See* Tr. at 744,

19

746. He included in his RFC assessment physical restrictions that included an ability to perform medium work with only occasionally climbing of ladders, ropes, and scaffolds and frequent overhead reaching with the right upper extremity. Tr. at 742. He noted that the consultative physician observed Plaintiff to have some crepitus with left knee ROM and with trunk flexion and extension, but that x-rays of his knee and foot showed no findings of acute bony abnormalities and only mild osteoarthritis in his knee. Tr. at 744. He stated "[t]here was no indication that his ability to move was affected or that he had difficulty getting on and off the examination table" and that "additional treatment notes reveal that despite his obesity, the claimant was able to move about generally well and sustain consistent function." *Id.* The ALJ mentioned the x-rays of Plaintiff's lumbosacral spine performed in April 2009 that showed some hypertrophic osteophytes in the lower thoracic spine. *Id.* He concluded there was no indication that Plaintiff was diagnosed with degenerative disc disease prior to his DLI and that "any limitations from such a condition would be considered in the above residual functional capacity assessment." *Id.* He stated that he accounted for Plaintiff's decreased ROM in his right shoulder by limiting Plaintiff to frequent overhead reaching with the right upper extremity. Tr. at 746.

Although the ALJ considered additional physical impairments as part of the RFC assessment, the assessed RFC does not reflect adequate consideration of the evidence of record regarding Plaintiff's physical impairments and functional limitations. Specifically, the ALJ neglected evidence regarding Plaintiff's abilities to stand and walk. He concluded that the evidence showed no impairment in Plaintiff's ability to move about (Tr. at 744), but failed to reconcile his conclusion with evidence in the record to the

contrary. *See* Tr. at 445 (whole body scan in January 2006 suggested arthropathy in bilateral knees and feet), 458 (Dr. McGill observed that Plaintiff required extra time and exertion to get on and off the exam table and to dress and undress and noted trace edema in his lower extremities), 460 (demonstrated impaired balance with tandem and heel-toe walk, had difficulty squatting, and demonstrated a slow, wide-based gait), 496 (a whole body scan on January 4, 2007, indicated arthritis in knees and ankles), 620 (noted right leg weakness; issued walking cane on March 11, 2008). Thus, the ALJ did not satisfy SSR 96-8p's requirement that he explain how any material inconsistencies or ambiguities in the record were resolved. Furthermore, the ALJ did not adequately consider Plaintiff's degenerative disc disease. The record refutes his finding that there was no evidence of degenerative disc disease prior to Plaintiff's DLI. *See* Tr. at 459 (Dr. McGill observed reduced ROM with lumbar flexion and extension and lateral flexion), 496 (January 2007 whole body scan suggested degenerative disc disease and osteophyte formation at the L5-S1 interface). While the ALJ stated that any limitations from degenerative disc disease would be accommodated by the assessed RFC, he failed to explain how the relevant evidence in the record supported his conclusion and to reconcile the evidence that was contrary to his conclusion, as required by SSR 96-8p. *Id*. In light of the foregoing, the undersigned recommends the court find the ALJ did not adequately consider how Plaintiff's physical impairments affected his ability to perform basic work activities.

2.    Moderate Limitation in Concentration, Persistence, or Pace

Plaintiff argues the ALJ's RFC assessment is not supported by substantial evidence. [ECF No. 14 at 10–11]. He maintains the ALJ failed to assess any limitations to

accommodate his moderate limitation in concentration, persistence, and pace. *Id.* at 11. He contends the ALJ erred in relying on his extremely limited ADLs to conclude that he could work on a regular and continuing basis. *Id.* at 12. He argues the restriction set forth by the ALJ is the same as that found inadequate to accommodate moderate limitations in concentration, persistence, and pace in *Mascio*, 780 F.3d 632.

The Commissioner argues the ALJ accommodated Plaintiff's moderate restrictions in concentration, persistence, and pace by restricting him to simple work. [ECF No. 15 at 16]. She maintains Plaintiff failed to establish that he had additional limitations that were not included in the RFC assessment. *Id.* She contends the medical evidence for the period at issue showed Plaintiff to have intact concentration and cognitive functioning; a logical and goal-directed thought process; and memory that was generally within normal limits. *Id.* at 17.

If a claimant alleges disability resulting from a mental impairment, the Regulations require that a special technique be used to evaluate the severity of the mental impairment. 20 C.F.R. § 404.1520a. The ALJ should first evaluate the individual's symptoms to determine if he has a medically-determinable mental impairment and then rate the degree of functional limitation that results from the impairment. 20 C.F.R. § 404.1520a(b). The ALJ must consider four functional areas in assessing the individual's degree of functional limitation, which include activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). If the ALJ finds that an individual has a severe mental impairment, but concludes that his functional limitations are not severe enough to meet or

equal a Listing, the ALJ should then proceed to consider the individual's mental functional limitations as part of the RFC assessment. 20 C.F.R. § 404.1520a(d)(3).

In *Mascio*, the Fourth Circuit found that the ALJ erred in assessing the plaintiff's RFC based on an incomplete hypothetical to the VE. Pertinent to Plaintiff's argument, the decision states "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Mascio*, 780 F.3d at 638. The court further explained that "the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work . . . [b]ut because the ALJ here gave no explanation, a remand is in order." *Id.* In several recent cases, this court has held that an ALJ adequately accounts for moderate limitations in concentration, persistence, or pace by explaining how this functional limitation was considered as part of the RFC assessment. *See Davis v. Colvin*, No. 0:14-4314-TMC-PJG, 2015 WL 7871172, at *4 (D.S.C. Dec. 4, 2015) ("As discussed above and contrary to the *Mascio* case, the ALJ accounted for Davis's limitations and credibility in determining her RFC prior to proceeding to steps four and five. Further, the ALJ found that any limitation in Davis's concentration, persistence, or pace did not affect her ability to perform simple, routine, repetitive tasks."); *Falls v. Colvin*, No. 8:14-195-RBH, 2015 WL 5797751, at *7 (D.S.C. Sept. 29, 2015) ("As opposed to the hypothetical in *Mascio*, which said nothing about the claimant's mental limitations, the ALJ's hypothetical in this case accounted for each of Plaintiff's mental limitations. The ALJ also accounted for Plaintiff's limitations in the area of concentration when determining Plaintiff's residual functional capacity.

The ALJ noted Plaintiff's mental limitations but found that the Plaintiff could 'concentrate, persist and work at pace to do simple, routine, repetitive work at 1–2 step instructions for extended periods say 2-hour periods in an 8-hour day.'"); *Gilbert v. Colvin*, No. 2:14-981-MGL-MGB, 2015 WL 5009225, at *14 (D.S.C. Aug. 19, 2015) ("In *Mascio*, the ALJ concluded the plaintiff had a moderate limitation in concentration, persistence, or pace but did not include any corresponding limitation in the plaintiff's RFC, nor did the ALJ explain the reasons for not including such a limitation. In the case *sub judice*, however, the ALJ limited Plaintiff to 'simple work,' specifically relying on Dr. Boland's assessment that despite Plaintiff's 'difficulty sustaining her concentration and pace on complex tasks,' Plaintiff 'should be able to . . . perform simple tasks without special supervision.'").

The ALJ considered Listing 12.06, but found that Plaintiff did not satisfy the Listing's paragraph "B" criteria because he had only mild restriction of ADLs; moderate difficulties in maintaining social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation. Tr. at 741–42. He explained that he concluded Plaintiff had moderate difficulties with regard to concentration, persistence, or pace based on his testimony that he had trouble remembering, concentrating, and thinking clearly during the period in question, but was able to spend his days watching television. Tr. at 742. The ALJ included in the RFC assessment a limitation to jobs that required Plaintiff understand, remember, and carry out only simple instructions and have no ongoing public contact. Tr. at 742. He acknowledged Plaintiff's testimony that he stopped working because he was forgetful and was making too many

24

mistakes. Tr. at 743. However, he concluded Plaintiff's symptoms "were not as severe and limiting as alleged." Tr. at 744. He noted Plaintiff was "rather vague in identifying his symptoms, aside from stating he had very short patience." *Id.* The ALJ indicated Plaintiff's mental status examinations generally showed him to have a stable mood, fair insight and judgment, and to lack suicidal or homicidal ideations or psychotic symptoms. *Id.* He noted that Plaintiff's global assessment of functioning ("GAF") scores[6] during the relevant period were stable and indicated no more than moderate symptoms. *Id.* He observed that Plaintiff did yard work, watched television, read the newspaper, occasionally visited his father and brother, bathed and dressed himself, drove a car, washed dishes, and could make a sandwich for himself. Tr. at 745.

Although the ALJ thoroughly explained his reasons for finding that Plaintiff had "no more than moderate symptoms" (Tr. at 744), he did not explain how the assessed RFC specifically accommodated Plaintiff's moderate limitations in concentration, persistence, or pace. Plaintiff alleged that he stopped working because he was forgetful and was making too many mistakes on his last job. Tr. at 766. In *Mascio*, the court acknowledged that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." 780 F.3d at 638. In light of Plaintiff's allegation of

---

[6] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

difficulty staying on task, the ALJ should have either included in the RFC assessment limitations related to Plaintiff's ability to stay on task or explained how the RFC he assessed accommodated Plaintiff's moderate limitations in concentration, persistence, or pace. Because he did neither, the undersigned recommends the court find he did not adequately accommodate Plaintiff's moderate limitations in concentration, persistence, or pace in the RFC assessment.

### 3.    Failure to Obtain VE Testimony

Plaintiff argues the ALJ's finding at step five is based on nothing more than his own opinion and that he erred in failing to obtain testimony from a VE. [ECF No. 14 at 12–13]. The Commissioner argues that the ALJ was not required to consult a VE because he reasonably concluded that the non-exertional limitations in Plaintiff's RFC did not erode his occupational base for unskilled medium work. [ECF No. 15 at 19–20]. She maintains the ALJ's conclusions were supported by SSRs 83-14 and 85-15. *Id.* at 21.

The Commissioner's burden to prove that a claimant can perform work that exists in significant numbers in the economy is triggered after the claimant establishes that he cannot perform his PRW. *Sawyer v. Colvin*, 995 F. Supp. 2d. 496, 507 (D.S.C. 2014). In the fifth step of the sequential evaluation process, the ALJ must consider the individual's RFC in conjunction with his age, education, and work experience. SSR 83-10. In 1979, the SSA promulgated table rules in Appendix 2 to Subpart P of Part 404, which are known as the medical-vocational guidelines or grid rules. *See id.* The rules consider the individual's RFC, age, education, and work experience and direct findings of "disabled" or "not disabled." *Id.* "Each grid considers only the strength or exertional component of a

26

claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). The grid rules "are only met where they are exactly met." SSR 83-11. They "are dispositive of whether a claimant is disabled only when the claimant suffers from purely exertional impairments." *Aistrop v. Barnhart*, 36 F. App'x 145, 146 (4th Cir. 2002).

Nevertheless, the grid rules may be used as a framework for evaluating a combination of exertional and non-exertional impairments where an individual's non-exertional impairments do not substantially reduce the range of work within the grid rule. SSR 83-14; *see also* 20 C.F.R. § 404.1569a(d) (when an individual has a combination of exertional and nonexertional limitations, "we will not directly apply the rules in appendix 2 unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rules provide a framework to guide our decision"). "After it has been decided that an impaired person can meet the primary strength requirements of sedentary, light, or medium work—sitting, standing, walking, lifting, carrying, pushing, and pulling—a further decision may be required as to how much of this potential occupational base remains, considering certain nonexertional limitations which the person may also have. SSR 83-14. "Not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." SSR 83-14, citing *Grant v. Schweiker*, 699 F.2d 189 (4th Cir. 1983).

"When a claimant: (1) suffers from a nonexertional impairment that restricts his ability to perform work of which he is exertionally capable, or (2) suffers an exertional limitation which restricts him from performing the full range of activity covered by a

work category, the ALJ may not rely on the Grids and must produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant." *Landrum v. Astrue*, No. 08-2678-TLW-JRM, 2010 WL 558599, at *7 (D.S.C. Feb. 10, 2010), citing *Walker*, 889 F.2d at 49; *Hammond v. Heckler*, 765 F.2d 424, 425– 26 (4th Cir. 1985); *Cook v. Chater*, 901 F. Supp. 971 (D.Md. 1995). To meet the burden to produce specific vocational evidence showing that the national economy provides employment opportunities, it is often necessary for the ALJ to solicit the services of a VE. *See Walker*, 889 F.2d at 50; *see also Aistrop*, 36 F. App'x at 147 (where the individual has both exertional and nonexertional impairments that prevent him from performing a full range of work at a given exertional level, "the Commissioner must prove through expert vocational testimony that jobs exist in the national economy which the claimant can perform").

The ALJ concluded that Plaintiff was unable to perform his PRW as a grave digger and house painter because those jobs were heavy as typically performed. Tr. at 746. However, he found that, through the DLI, "there were jobs that existed in significant numbers in the national economy that the claimant could have performed." *Id.* The ALJ explained his conclusion as follows:

> Through the date last insured, if the claimant had the residual functional capacity to perform the full range of medium work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.15 and Rule 203.07. However, the additional limitations had little or no effect on the occupational base of unskilled medium work. Specifically, the limitation on climbing ladders/ropes/scaffolds would not significantly erode the medium occupational base. Social Security Ruling 83-14. Additionally, the limitation on overhead reaching would not significantly erode the medium

occupational base as other forms of reaching were intact and it affected only one arm with a restriction to "frequent" but not "continuous." Social Security Ruling 85-15. The environmental limitations would not significantly erode the medium occupational base as these are not present in most occupations and the exposure was limited to only "concentrated." Social Security Ruling 85-15. The limitations to understanding, remembering and carrying out simple instructions and no ongoing public contact would not preclude unskilled work. Social Security Ruling 85-15. A finding of "not disabled' is therefore appropriate under these rules.

Tr. at 747. Essentially, the ALJ concluded that the services of a VE were unnecessary because he relied on grid rules 203.07 and 203.15 as a framework and assessed nonexertional limitations that did not significantly erode the medium occupational base. *See id.*

Although "not every nonexertional limitation rises to the level of a nonexertional impairment so as to preclude" reliance on the grid rules (SSR 83-14), the ALJ recognized that Plaintiff had nonexertional impairments. *See* Tr. at 740 (finding PTSD to be a severe impairment). Because Plaintiff had a combination of exertional and nonexertional impairments, the grid rules were not dispositive of Plaintiff's claim. *See Walker*, 889 F.2d at 49; SSR 83-11; *Aistrop*, 36 F. App'x at 146.

While an ALJ may use the grid rules as a framework for decisionmaking where an individual's nonexertional limitations do not significantly reduce the occupational base (SSR 83-14), the ALJ cited insufficient evidence to support his conclusion that Plaintiff's nonexertional limitations did not significantly reduce the occupational base. The ALJ relied on SSR 85-15 to sustain his finding that a restriction to understanding, remembering, and carrying out simple instructions and performing jobs with no ongoing public contact did not significantly reduce the base of unskilled work. *See* Tr. at 747.

29

While SSR 85-15 provides that unskilled jobs "ordinarily involve dealing primarily with objects, rather than with data or people," and "generally provide substantial vocational opportunity for persons with solely mental impairments," the ALJ ignored the fact that Plaintiff's impairments were not solely mental. The ALJ also argued that limiting Plaintiff to only frequent overhead reaching with the right upper extremity had little to no effect on the medium occupational base. *See* Tr. at 747. However, SSR 85-15 specifically recognizes that, while a significant limitation in reaching or handling may eliminate a large number of occupations, "varying degrees of limitations would have different effects" and may necessitate a VE's assistance "to determine the effects of the limitations." The ALJ cited SSR 85-15 to sustain his conclusion that Plaintiff's need to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, would have little to no effect on the medium occupational base. *See* Tr. at 747. Although SSR 85-15 provides that a medical restriction to avoid "excessive amounts of noise, dust, etc." would have minimal impact on the broad world of world, it also notes that an individual's ability to tolerate very little noise, dust, etc., would have a considerable impact and indicates that "[w]here the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupation reference materials" or the services of a VE. Thus, it appears that the ALJ erred in relying on SSR 85-15 to conclude that the occupational base would not be eroded by the nonexertional limitations he assessed.

Furthermore, without specific vocational testimony, it is impossible to determine the effect on the occupational base of multiple restrictions that only reduce the

30

occupational base slightly when considered singularly, but that may reduce the occupational base significantly when considered in combination. A review of SSRs 83-14 and 85-15 provides no quantifiable explanation of what is meant by a "significant effect" or "impact" as opposed to a "minimal" or "insignificant impact" on the "broad world of work." Thus, it is impossible to determine whether something that has a minimal impact reduces the occupational base by less than one percent or greater than 10 percent. Despite the absence of quantifiable evidence regarding the reduction, it logically follows that each nonexertional limitation reduces the occupational base by some amount and that the combination of multiple nonexertional limitations would eventually lead to a significant reduction in the occupational base.

In light of the foregoing, the undersigned recommends the court find the ALJ failed to meet his obligation to produce evidence that jobs existed in significant numbers in the national economy that Plaintiff could perform with the restrictions he assessed.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

April 1, 2016                                    Shiva V. Hodges
Columbia, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).